UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW JERSEY

SUPERNUS PHARMACEUTICALS,          .
INC.,                              .
                                   .
       Plaintiff,                  . Case No. 14-cv-06102,
                                   . 14-cv-7272 and 15-cv-326
vs.                                .
                                   . Newark, New Jersey
ACTAVIS, INC., et al.,             . August 24, 2015
                                   .
       Defendants,                 .
                                   .
And related actions.               .


                     TRANSCRIPT OF HEARING
             BEFORE THE HONORABLE STEVEN C. MANNION
                 UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Plaintiff:      WILLIAM C. BATON, ESQ.
                        Saul Ewing
                        One Riverfront Plaza
                        Newark, NJ  07102
                        (973) 286-6700
                        Email: Wbaton@saul.com

                        RICHARD FRANK KURZ, ESQ.
                        Frommer Lawrence & Haug LLP
                        745 Fifth Avenue
                        New York, NY 10151
                        (212) 588-0800
                        Email: Rkurz@flhlaw.com

                        ED H. HAUG, ESQ.
                        Frommer Lawrence & Haug LLP
                        745 Fifth Avenue
                        New York, NY 10151
                        (212) 588-0800
                        Email: Ehaug@flhlaw.com

```
 1                              SANDRA KUZMICH, Ph.D.
                                Frommer Lawrence & Haug LLP
 2                              745 Fifth Avenue
                                New York, NY 10151
 3                              (212) 588-0800
                                Email: Skuzmich@flhlaw.com
 4

 5    For the Defendant        JOSEPH N. FROEHLICH, ESQ.
      Zydus:                   Locke Lord LLP
 6                              Three World Financial Center, Suite
                                2001
 7                              New York, NY 10281-2101
                                (212) 812-8345
 8                              Email: Jfroehlich@lockelord.com

 9                              JAMES T. PETERKA, ESQ.
                                Locke Lord LLP
10                              111 South Wacker Drive
                                Chicago, IL 60606
11                              (312) 443-0270
                                Email: Jpeterka@lockelord.com
12
                                MICHAEL J. GAERTNER, ESQ.
13                              Locke Lord LLP
                                111 South Wacker Drive
14                              Chicago, IL 60606
                                (312) 443-1722
15                              Email: Mgaertner@lockelord.com

16

17    For the Defendant        GERI L. ALBIN, ESQ.
      Par:                     Saiber
18                              18 Columbia Turnpike, Suite 200
                                Florham Park, NJ  07932
19                              (973) 845-7719
                                Email: Galbin@saiber.com
20
                                TERRENCE J. CONNOLLY, ESQ.
21                              Latham & Watkins
                                885 Third Avenue
22                              New York, NY 10022-4834
                                (212) 906-1853
23                              Email: Terrence.connolly@lw.com

24

25
```

```
 1  For the Defendant        CHRISTINE INTROMASSO GANNON, ESQ.
    Actavis:                 Connell Foley, LLP
 2                           86 Livingston Avenue
                             Roseland, NJ 07068
 3                           (973) 597-3168
                             Email: Cgannon@connellfoley.com
 4
                             B. JEFFERSON BOGGS, JR., ESQ.
 5                           Merchant & Gould P.C.
                             1701 Duke Street, Suite 310
 6                           Alexandria, VA 22314
                             (703) 684-2515
 7

 8  Audio Operator:

 9  Transcription Service:       KING TRANSCRIPTION SERVICES
                                 3 South Corporate Drive, Suite 203
10                               Riverdale, NJ  07457
                                 (973) 237-6080
11
    Proceedings recorded by electronic sound recording; transcript
12  produced by transcription service.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                           I N D E X

2

3    Proceeding                                        Page

4       Proceedings                                      5

5       Topic: DCO, general access                       6

6            The Court's Ruling                         25

7       Topic: DCO, cross-party access                  25

8            The Court reserves ruling                  31

9       Topic: Patent prosecution bar                   31

10      Topic: Amendments to the schedule               36

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (Commencement of proceedings at 4:05 P.M.)

 2

 3              THE COURT:  We're on the record, civil action

 4  14-6102, Supernus Pharmaceuticals v. Actavis, Zydus

 5  Pharmaceutical Companies, and Par Pharmaceuticals, Docket

 6  14 -- excuse me -- Docket 14-7272 and Docket 15-326.

 7              All right.  And the controlling docket would be

 8  14-cv-6102.

 9              Appearances of counsel, beginning with plaintiffs.

10              MR. BATON:  Good afternoon, Your Honor, Bill Baton

11  of Saul Ewing for the plaintiff.

12              THE COURT:  Good afternoon.

13              MR. HAUG:  Also Ed Haug from Frommer

14  Lawrence & Haug, also for the plaintiff Supernus; my partner

15  Richard Kurz.  And next to him, my other partner Dr. Kuzmich.

16              THE COURT:  Welcome.  Welcome.

17              For defense?

18              MR. FROEHLICH:  Good afternoon, Your Honor, Joseph

19  Froehlich from Locke Lord.  And with my are my partners

20  Michael Gaertner and James Peterka.

21              THE COURT:  Welcome.

22              MR. FROEHLICH:  On behalf of Zydus.

23              MR. GAERTNER:  Yes, good morning -- good afternoon,

24  Your Honor, Mike Gaertner on behalf of Zydus Pharmaceuticals

25  U.S.A. Inc. and Cadila Healthcare Limited.

1            THE COURT:  Welcome.

2            MS. ALBIN:  Good afternoon, Your Honor, Geri Albin

3    from the Saiber law firm for the Par defendants.  And with me

4    is Terrence Connolly from Latham & Watkins also for the Par

5    defendants.

6            UNIDENTIFIED SPEAKERS:  Good afternoon.

7            MS. GANNON:  Good afternoon, Your Honor, Christine

8    Gannon from Connell Foley on behalf of the Actavis

9    defendants.  And with me is my cocounsel from

10   Merchant & Gould, Jeff Boggs.

11           THE COURT:  Okay.  Good afternoon.  All right.

12           So, first, the good news is we each have

13   microphones for the most part.  We're not sharing just the

14   two that I had in my old courtroom, which is an upgrade.

15           But when you speak, just since there's so many of

16   us, if you would just say your name prior to speaking.  That

17   way, the record will be clear on who has what since the

18   matter is being recorded.

19           Okay?  All righty.  So my understanding, from your

20   agenda letter, the first issue for us to discuss today is the

21   discovery confidentiality order.  You folks had a number of

22   disagreements on the proposal.  And who would like to be

23   heard first on that?

24           MR. HAUG:  Your Honor, this is Ed Haug for

25   Supernus.

1          The disagreements that remain are set forth in the

2   letters that we had submitted to the Court.  I think it's --

3          THE COURT:  Has it been narrowed at all?

4          MR. HAUG:  From June, I don't believe they have

5   been, no.

6          THE COURT:  Okay.  And not narrowed at all since

7   the submission, Docket Entry 71?  No?

8          MR. HAUG:  I don't think so, no.

9          THE COURT:  Okay.  All righty.  So the floor is

10  yours.

11         MR. HAUG:  Oh, okay, there are a number of issues.

12         THE COURT:  We'll just take them one at a time.

13         MR. HAUG:  Right.  Okay.  Very good.

14         I would start with who should have access.  Who

15  should have access?

16         THE COURT:  In-house or out-house --

17         MR. HAUG:  Right.

18         THE COURT:  All right.  Go ahead.

19         MR. HAUG:  Okay.  So the plaintiffs here say that

20  access, we should have a "highly confidential" category of

21  information, the most sensitive information to the parties.

22         We have proposed that that be -- if there's going

23  to be any in-house counsel, then because Supernus doesn't

24  have in-house counsel, they have another person, legal

25  representative or technical person, if you will, that would

 1  have access.  And I believe one of the defendants also is of

 2  that view or close to that view.

 3              THE COURT:  Okay.

 4              MR. HAUG:  So that's one issue.

 5              THE COURT:  Okay.  And that person for Supernus

 6  would be who?  Who are you proposing?

 7              MR. HAUG:  Well, I don't know -- actually ...

 8              Yeah, we haven't identified any particular

 9  individual yet, but I think I know who it would be.

10              THE COURT:  Why not?  Why haven't you identified

11  this?

12              MR. HAUG:  We haven't had agreement.  They won't to

13  agree that we can have one at all, so -- and they haven't

14  identified their in-house counsel either, for that matter,

15  which is an issue.

16              THE COURT:  Okay.

17              MR. HAUG:  And I think that that has to go -- it

18  relates also to another issue, a dispute here, which is the

19  defendants take the position that highly confidential

20  information cannot be disclosed to outside counsel for any

21  parties other than the party producing the information.  So

22  we have three defendants here.  So if Par, for example,

23  produces information that they designate as highly

24  confidential, then we cannot disclose that in any way or use

25  this in this case and disclose it to the other two defendants

1    in the case, for any purpose.  And we have a real problem

2    with that since these cases are consolidated.

3              THE COURT:  So we've got the cross-party access

4    issue.

5              The second one?  And the general access is the

6    first issue.

7              MR. HAUG:  That's correct.

8              THE COURT:  Okay.  So let me hear you on the

9    general access issue first.  Yes.

10             MR. HAUG:  I think on the general access issue, I

11   think that the problem with allowing in-house counsel to have

12   access to competitive information, which is what it is, we're

13   talking about commercial, technical, all kinds of highly

14   proprietary information, to allow that to be disclosed to a

15   competitive decision-maker would be a very serious problem

16   and work a prejudice.

17             Now, I think the comeback to that is, well,

18   in-house counsel's not a competitive decision-maker.

19             However, that's a factual issue, and since I don't

20   know who their in-house counsel is that they're even think --

21   well, actually in their proposal, they say any in-house

22   counsel, so it's not even limited to one, presumably.

23             But in any event, our position is highly

24   proprietary -- highly competitive information should not be

25   allowed to be disclosed to a competitor -- a competitor,

1   in-house counsel, and in this business, in-house counsel is

2   indeed involved in competitive decision-making, certainly,

3   based on my experience.

4          So I would propose either no in-house counsel and

5   no technical advisors at all, and we have this category of

6   highly confidential information, which is outside counsel

7   eyes only, or, if the Court is going to allow in-house

8   counsel, then I think we have to be very careful to determine

9   who that in-house would be and as to matter of fairness, we

10  then believe that ESI -- well, I won't speak for Zydus, I'll

11  let them speak for themselves, but certainly Supernus should

12  have a designee.  I think the designee would probably be

13  Dr. Viera.

14          THE COURT:  Dr. Viera?

15          MR. HAUG:  V-i-e-r-a.  But we would have to --

16  yeah, well, maybe not.  So I -- I would have to reserve on

17  who that would actually be.

18          THE COURT:  Okay.  Thank you.

19          Sticking just with the general access issue.

20          MR. CONNOLLY:  Your Honor, Terrence Connolly,

21  Latham & Watkins for Par.

22          THE COURT:  Okay.

23          MR. CONNOLLY:  Your Honor, and if this is not going

24  through, just let me know.

25          A couple of things, Your Honor.  First off, Par is

1    very large generic company.  The parties not similarly

2    situated.  Supernus is a small company.  They don't have an

3    in-house lawyer.  They want to designate somebody who they

4    admit is a technical person within the company to use that.

5              The -- the Par is a massive generic company.  They

6    have dozens and dozens and dozens of these cases.  They have

7    in-house lawyers whose job it is is to be lawyers, to

8    litigate the cases.  Not to be involved with development of

9    the product -- of new products.  They're not tech- -- they're

10   not scientists.  So you don't have the risk, Your Honor, that

11   you have -- and the case law supports us on this, where a

12   technical person exposed to the information, even though

13   they've signed an undertaking, cannot parse her or his brain

14   to forget that which the confidential information that they

15   were exposed to.  So the reason why there -- the case law is

16   pretty clear, if there's a big distinction between lawyers

17   and technical people is the party in-house lawyers -- and I

18   think Actavis will agree, they're even more massive than Par

19   is -- their lawyers are lawyers.  They're -- they want to

20   litigate the case together with their outside counsel.  They

21   want to be exposed to the pleadings that are submitted in the

22   case.  They want to be exposed to the expert declarations

23   that are submitted, including exhibits.  They want to see

24   drafts of what our expert declarations are, much like they

25   want to be sitting in a conference room in my office working

1    through the materials.

2            And they don't want to be hamstrung from acting as

3    lawyers in the case.

4            THE COURT:  And is there any reason why Par can't

5    designate specific people?

6            MR. CONNOLLY:  They -- they certainly could,

7    Your Honor, I -- first off, the protective order calls for

8    two designees.  I'd be happy to disclose those two designees,

9    and they can approve or disapprove.  I can't do it right now

10   because I don't know specifically who the two would be.  But

11   these are -- these are full-time lawyers, Your Honor.  And

12   it's not that they want to be disclosed to all the technical

13   information in the case.  But, Your Honor, I just wanted to

14   point out for you, just for your ease of references after

15   this is over and you want to go through this, Exhibit A to

16   the June 11th letter, which is Docket Number 62, is a

17   proposed order, and it has both parties' proposals set out

18   side by side.  So you'll see -- and that document can sort of

19   be the -- the summary document where you can say, well, I'm

20   not so sure that I followed all that good verbosity in the

21   letter, here's where the proof is, you know -- or the rubber

22   hits the road -- and --

23           THE COURT:  Docket Entry 62, you said?

24           MR. CONNOLLY:  It's -- yeah, Docket number 62 in

25   Exhibit A thereto.

1          THE COURT:  Okay.

2          MR. CONNOLLY:  So what we were asking for,

3   Your Honor, is a very specific subset of the documents, the

4   ANDA, the development documents, and the samples that are

5   going to be produced pursuant to our request.  Not all the

6   other information that Supernus's counsel was describing.

7          Specifically, Your Honor, it's narrowly tailored to

8   allow in-house lawyers, who are two cocounsel, to outside

9   counsel, to basically participate in the litigation as if

10  they are lawyers.  So -- you know, but there's a big

11  distinction, Your Honor, and I think that it is important,

12  and it's borne out by the case law that we cited in the

13  verbose cover letter that I just referred to, and that is

14  there's a big distinction between technical experts and

15  outside counsel.

16          THE COURT:  And that Dr. Viera you would consider

17  to be a technical expert or --

18          MR. CONNOLLY:  You know, Your Honor that's the

19  first name that I've had heard.  I don't know anything about

20  it.  You'll see a footnote in this letter, we had asked for

21  the specific names and the CV and job responsibilities of the

22  people in an effort to compromise.  And that information

23  wasn't forthcoming.

24          So that's the first I've heard of it.

25          I'd be happy to look at any information that they

1   can.

2           Our concern, Your Honor, again, has to do with the

3   fact that once a technical person is exposed to data, even

4   though they -- he or she may have the purest motives in the

5   world, you can't unlearn what you learn.  And so if you're

6   sitting at a bench and you're developing product, there's --

7   there's just no way any human being can segregate that

8   information and say I don't know.  It's -- there's no way to

9   unscramble the egg.

10           Totally different situation when you're dealing

11  with outside lawyers who are not developing products.  They

12  want to -- they just want to co-litigate the case with us.

13           Very important, I will say this, Your Honor, I've

14  done a lot of these cases.  This kind of thing is not unusual

15  to allow, you know, in-house lawyers access to this

16  specific -- this subset of information that we think should

17  be designated as confidential, and we --

18           THE COURT:  I would agree it's not unusual in any

19  of the cases I've had.

20           MR. CONNOLLY:  Okay, Your Honor, that's issue

21  Number 1, and I think I -- you asked me to -- that one.

22           THE COURT:  Okay.  I'll sit with that one.  Now,

23  I'm going to flip back over here for a moment on -- they ask

24  for a name, for what representative you wanted.  Why have --

25  why is the meet-and-confer process complete that we're here

1   at this point if you folks haven't even given names back and

2   forth?

3          MR. HAUG:  Because they have not said they would

4   ever agree to an in-house technical person for all the

5   reasons Mr. Connolly just discussed.

6          THE COURT:  Okay.  But still -- but why not

7   provide --

8          MR. HAUG:  I mean I think that was a --

9          THE COURT:  -- the name of your proposal so at

10  least the Court has a person that can weigh whether or not

11  this person meets the standards.

12         MR. HAUG:  Well, if -- if Your Honor is inclined to

13  allow that, then that's what we would do, obviously.

14         And just like any -- I spent a lot of years on the

15  generic side in this business, and my experience is not like

16  Mr. Connolly's at all.  In-house lawyers are very much

17  involved in the business of the company.  They review the

18  products.  They review candidates for products.  They get

19  involved in settlement discussions.  And what we really would

20  have here is an imbalance in that we would have in-house

21  counsel for these defendants who are very much up to speed an

22  everything going on in the case, and if they sit down and try

23  to talk settlement, for example, there is no one, absolutely

24  no one at Supernus who has any idea of any of the

25  confidential information that's been produced in the case.

1          So that is another imbalance that we have here.

2          I agree there are many cases where in-house counsel

3   has been permitted access or at least limited access.  But

4   there are also many, many cases where highly confidential is

5   outside counsel eyes only.  And so it usually -- so I mean,

6   you have two- tiered orders all the time.  It's not unusual

7   at all.

8          And so -- now, I would also comment, Mr. Connolly

9   said saying --

10          THE COURT:  And -- sorry -- which case are you

11  general to rely on for the two-tiered for the outside only?

12          MR. HAUG:  Yes.  Now, Mr. Connolly did say

13  something here -- he said there's a subset of documents.  He

14  mentioned the ANDA, the NDA, and a few other things, research

15  and development, maybe.

16          But I'm looking at paragraph 8 that they're

17  proposing to put into this DCO, and it says:  Notwithstanding

18  the foregoing, any in-house counsel shall have access to any

19  motions, briefs, pleadings, documents filed with the Court,

20  contention interrogatory responses, expert reports, or any

21  drafts of or exhibits to the foregoing.

22          That is completely open-ended.  That's everything.

23          And so I don't --

24          THE COURT:  And by the "any," you're saying he's

25  saying that that would go beyond the one or two persons to be

1    designated?

2              MR. HAUG:  Well, the "any," yes, that is clearly

3    not limited to two or one.

4              And also the category in paragraph 8 here where it

5    says "notwithstanding the foregoing," opens it up for them to

6    have access to expert reports, for example.  All right.

7    Expert reports.  Then presumably expert depositions.

8              I mean, really what they're asking for is that

9    in-house counsel be treated as counsel of record.  And now,

10   if in-house counsel wanted to become counsel of record, maybe

11   that -- they could do that, and that would be a different

12   issue.  Then they're counsel of record, and they're bound by

13   all of the obligations that counsel of record is -- or are.

14             And that's -- but that's not really what's

15   happening.  Right now, this is open-ended.  It's any counsel.

16   It's -- there's no limitation on what they can see.  They can

17   see everything, from the way I'm reading what they're

18   proposing here.

19             And so, however, I think that -- I think we may be

20   able go along with -- if we can agree on a limitation of what

21   information we're permitting in-house counsel to see, like

22   what I just heard, the NDA, the ANDA, and I'd have to talk a

23   little more about what other documents they're looking for.

24             They're not commercial, proprietary, commercial

25   marketing plans, for example, and all the other things that

 1   would be highly -- designated highly confidential.

 2            THE COURT:  Okay.  Is that something that you two

 3   need to talk more about?  --

 4            MR. CONNOLLY:  Your Honor, I'm always happy to

 5   talk.  I mean, we had recently -- we basically tried to -- as

 6   said, we offered to look at résumés.  That was declined.

 7            The -- and just so we're clear, Your Honor, the

 8   limitations that I described are in paragraph 2, it's really

 9   two different provisions that are here.

10            THE COURT:  Of Exhibit A?

11            MR. CONNOLLY:  Of Exhibit A.

12            THE COURT:  Okay.

13            MR. CONNOLLY:  And on page 5 of Exhibit A of

14   Document 62, there's a side-by-said comparison, and it

15   basically says, they will not designate as highly

16   confidential information, three categories of documents:  The

17   NDA, information relating to the research and development of

18   the various NDAs and ANDAs, and samples of the products or

19   documents referring or relating to the products.

20            So that's where I got those -- that trilogy.  It's

21   there on page 5 of Exhibit A of Document 62.

22            With respect to paragraph 8, which is page 8 of

23   Exhibit A of Document 61, this -- what that says is:

24   Notwithstanding the foregoing, any in-house counsel shall

25   have access to motions, briefs, pleadings, documents filed

 1    with the Court, contention interrogatory responses, expert

 2    reports, or drafts or exhibits to the foregoing.

 3           Now, we're -- we're not going to have access to

 4    their drafts of their reports, obviously.  We're going to

 5    have access to the final contention interrogatories, expert

 6    reports, et cetera.

 7           The drafts language has to do with our ability to

 8    share our draft expert reports with in-house counsel.

 9           So there -- these are litigation-related documents,

10    Your Honor.  And the -- the fact of the matter is in-house

11    lawyers are bound by the same rules of governing professional

12    conduct we are, whether we're counsel of record or not.

13    There's an undertaking here, Your Honor.  And there's not the

14    threat or risk of a good faith but an innocent misuse of the

15    information because information is buried in somebody's

16    brain.  So that's -- that is the request that Par has made,

17    Your Honor.

18           And as I said, again, Your Honor, respectfully,

19    I've never had to litigate this before, because this is

20    standard operating procedure in the cases that I've -- I've

21    handled.  And I think we did cite several similar cases in

22    the text of the June 11th letter, which is Document 62.

23           MR. GAERTNER:  Your Honor?

24           THE COURT:  Yes.

25           MR. GAERTNER:  Mike Gaertner on behalf of Zydus.

1           And I think Mr. Connolly was kind enough to make a

2     remark at the beginning of his argument that not all of the

3     companies are similarly situated here.  And I think I'd like

4     to -- if you can indulge me just a minutes.

5           THE COURT:  Please.

6           MR. GAERTNER:  Zydus is a small company.  Zydus

7     does not have a barred U.S. attorney on staff.  We do have a

8     chief legal officer, though, Bridge Cara [phonetic], who

9     we've identified to the other idea in other litigation as

10    well, who would be our contact person.  And Bridge Cara

11    serves a legal function.  That's what he does.  But he's not

12    a barred U.S. attorney.

13          And if -- really the issues we have are, are we're

14    going to have a two-tiered confidentiality order with a

15    highly confidential or confidential?  And then within those

16    substrata, who's going to have access to those sorts of

17    things.

18          If we start with the highly confidential

19    information, I think that the issue on the table is, as

20    Mr. Connolly's pointed out, are inside counsel going to have

21    access to certain technical documents and other things.

22          Oftentimes in my experience, it would be my

23    proposal that inside counsel didn't get confidential

24    information.  We -- that's been briefed in the papers, and

25    we've already presented that to you, and I think the folks

1   have argued that side.  That way -- I actually -- I hate to

2   say it, but I agree with Mr. Haug.  I would like to see it

3   more limited.  Highly confidential.

4          Now, on the confidential information, that's really

5   who's going to get the nuts and bolts of everything in the

6   case other than the super secret stuff.  That's what it kicks

7   in where we point out that we're in a middle ground approach

8   here, since we don't -- we're not asking for a technical

9   person, and I'm going to talk about Mr. Haug's proposal in a

10  second.  We don't have a barred U.S. counsel.  And so we're

11  stuck in a position where if we don't get a legal

12  representative, not a barred lawyer, but a legal

13  representative -- so we could have communications with them,

14  we don't think that's appropriate.

15         Now, I'm happy that Mr. Haug has finally pointed

16  somebody who they want to have as a representative, and we'll

17  tell you this is going to create some issues here, because

18  Dr. Viera's actually an inventor.  And so that creates big

19  issues in this case, if he gets access to confidential and

20  highly confidential information.

21         They're still -- they're still prosecuting patents.

22  I don't know what he's an inventor on those, but you can see

23  how this would spin and why we're so gosh darned concerned

24  about having technical people have access to our information

25  when patents are being prosecuted.

1           But in sum, on the confidential information --

2           THE COURT:  You folks can't ever just bring me the

3    easy stuff.  Right?

4           MR. GAERTNER:  No, we can't.  That's why you got

5    the big new courtroom.

6           But it's just in sum, if we stratify this without

7    mushing everything together, highly confidential on behalf of

8    the Zydus, we would like to see it limited.  On with respect

9    to getting technical information to even in-house counsel,

10   but on the confidential information, the substrata, we also

11   believe that it's inappropriate to have technical experts,

12   but we'd indulge the Court that we -- especially for Zydus,

13   without having an in-house legal representative, who I've

14   just identified and we've identified before, and that's his

15   job, we wouldn't have anybody to have access to in this case.

16   And we don't think that would be fair or appropriate,

17   Your Honor.

18          Thank you.

19          THE COURT:  Thank you.  Anyone else over here?

20          MR. BOGGS:  I'll just say Mr. Connolly --

21          THE COURT:  Oh, your name?  For the record.

22          MR. BOGGS:  Jeff Boggs for Actavis.

23          Mr. Connolly described the Actavis model almost

24   perfectly.  We have -- we work with people in-house at

25   Actavis.

1          THE COURT:  It's because you're bigger than all the

2   others.  Right.

3          MR. BOGGS:  Their one and only job is to supervise

4   the litigation.  That's all they do.  They -- and more

5   importantly, they are not competitive decision-makers.  They

6   make sure they're not, just for this very purpose.

7          And like Mr. Connolly said, this is very normal.

8   They're involved in many, many cases, and they've signed on

9   to many, many undertakings and protective orders.  That's

10  what they do.

11         And there just is no risk associated with them.

12         Dr. Viera, there's a lot of risk with him.  And, in

13  fact, Actavis has had him excluded in another case in New

14  Jersey.

15         But I really don't have much to add to what

16  Mr. Connolly has said, thank you.  Thank you for that.

17         THE COURT:  Okay.  Thank you.  And you would also

18  designate your one or two people.

19         MR. BOGGS:  Yeah, we would designate two people.

20  I'm a little hesitant on that, because there's been some real

21  recent changes at Actavis.  So I just want to check that.

22  But I could do that within a half hour when we get out of

23  here.

24         THE COURT:  Okay.

25         MR. BOGGS:  It will be one or four or five people

1   that we work with.

2            THE COURT:  Okay.  Got it.

3            Any reply?

4            MR. HAUG:  Very briefly, even accepting that these

5   people that I don't know the name of at -- they're talking

6   about in-house being their job is only managing litigation,

7   which I have a real question about, what happens when we talk

8   settlement, which is typical and usually happens in every

9   case?  How can an in-house lawyer, who has now had access to

10  all the confidential information in the case, highly

11  confidential information in the case, including of their

12  competitors, how can they not be in a position of making a

13  competitive business decision when they are now going to

14  counsel management on what is or isn't a good deal?

15           It's impossible.  They are now acting as a business

16  person for the company, as soon as they start talking about

17  settlement.

18           THE COURT:  And how would it be any different than

19  you?

20           MR. HAUG:  I'm outside counsel, and -- and someone

21  has to have access to the information.  And it's got to be

22  the court and the outside counsel, when you're at that

23  highest level, I believe.

24           And I think if you get to a settlement point in the

25  case, one or the other parties can always ask the Court or

1   ask the other side to try to agree on getting limited access

2   or necessary access to that person for that -- for the

3   settlement conference.

4           But to give unbridled access to any and everything

5   in the case and we don't even know what they're looking at or

6   how they're looking at it, works a severe prejudice.

7           And so as a proposal, I guess, at this point, to my

8   colleagues here.  I would be willing to try to come together

9   with very focused, limited amount of information that can

10  be -- that would be outside counsel eyes only.  Let's do it

11  that way.  Okay.  The most highly proprietary information

12  that the parties have so that that's only highly confidential

13  for outside counsel, and then they can have in-house counsel

14  have access to confidential-designated material.

15          THE COURT:  Okay.  Well, I will leave you folks to

16  meet and confer on that after we conclude.  The courtroom

17  will be yours for that.

18          Let me hear you on cross-party access.

19          MR. HAUG:  As I said before, this is Ed Haug again

20  for Supernus --

21          THE COURT:  And these cases are they consolidated

22  for all purposes?

23          MR. HAUG:  They are -- they're all pretrial.

24          THE COURT:  Oh, pretrial.  Got it.  Okay.

25          MR. HAUG:  Correct.  Okay.

1             So what does it really mean?  First of all, the

2    defendants are producing information or will be producing

3    documents and information, obviously, about their respective

4    products.  They also have contentions in the case.  We are in

5    the midst of moving forward with the Markman part of the

6    case, claim construction.

7             I assume --

8             THE COURT:  Which I think happens in January?  Is

9    that right?

10            MR. HAUG:  Yes, we'll be ready to inform the Court

11   for a date in January.

12            I am assuming there will be one Markman hearing and

13   not three.

14            And so I don't even know how, if -- if we're not

15   consolidated for purposes of using information that's

16   produced in the case that may be relevant to claim

17   construction, that's going to be a real problem in briefing,

18   it'll be a problem ultimately in the hearing.  And I don't

19   think the Court is going to entertain for very long having

20   more than one Markman hearing in this case.

21            So that's one.

22            Secondly, when we get to the expert phase, our

23   experts will be looking at all the information in the case

24   from all defendants in the case, and their expert reports

25   will necessarily, I think, take into account all of that

1   information.  And I don't see how you even parse and separate

2   that other than to have our experts now do three independent

3   separate expert reports and then we get independent expert --

4   in other words, everything multiples by three, which

5   completely defeats the purpose of consolidation in the first

6   place.

7              Now, I -- I heard what Mr. Gaertner said about him

8   not wanting in-house counsel from his competitors to see his

9   confidential information.  I appreciate that, and I agree

10  with him.  I don't think they should.

11             But I am not talking about giving access to

12  in-house counsel of his client's ANDA.  It should be outside

13  counsel eyes only on that, for that very reason.

14             THE COURT:  Okay.  Anything else?

15             MR. HAUG:  I really don't have anything else.

16             THE COURT:  Okay.  Thank you.

17             MR. CONNOLLY:  Your Honor, Terrence Connelly for

18  Par.

19             Your Honor, I'm struggling to find out how the

20  defendants' technical information could conceivably be

21  relevant to claim construction.  I don't see that connection,

22  but if it turns out that there is a hearing that -- you know,

23  that then you can talk about how you address that, but I

24  honestly think that claim construction is not something

25  that's going to implicate the individual ANDAs of the

1    defendants.  That's issue number one.

2            And issue number two, Your Honor, this -- you know,

3    again, Your Honor, I'd -- not to beat a dead horse, but I've

4    been in a lot of these cases, and I'm a codefendant in many

5    of them, and routinely, every -- the defendant -- the

6    plaintiff prepares common documents on invalidity, because

7    those issues are common and typically didn't implicate the

8    defendants' individual products and confidential information.

9    And routinely, the branded companies then deliver specified,

10   unique infringement allegations or -- and expert reports with

11   respect to infringement allegations.  And, in fact, routinely

12   Defendant 1 doesn't attend -- doesn't typically attend the

13   deposition of Defendant 2's technical experts.  And that's

14   just the way it goes in these cases, Your Honor, that -- and

15   any difficulties that are caused by the fact that there are

16   three defendants in this case is the direct result of the

17   fact that plaintiffs sued three defendants in this case.

18           And, you know, typically, Your Honor, they could --

19   we could have been sued in three different cases in two

20   different jurisdictions.  And there wouldn't be any

21   cross-pollinezation [*sic*] of this kind of stuff.

22           The -- this is a routine problem that comes up in

23   these cases, Your Honor.  And I -- routinely, members of

24   joint defense groups get to see the infringement allegations

25   that relate to them and not the others.

1           Now, if the defendants choose to share that

2    information among themselves as a matter of whatever reason,

3    that should -- that's their right.

4           But the plaintiff in the case should not have the

5    ability --

6           THE COURT:  To publicize.

7           MR. CONNOLLY:  -- to publicize that information.

8    And that's what we're talking about, Your Honor.  And, again,

9    this is a problem of their making.  I mean, you know, they

10   want to let me out of the case, great, I'll sit down and, you

11   know, dismiss me with prejudice and I'd wish you all adieu.

12          But I'm in the case.  It's competitively sensitive

13   information.  We shouldn't -- they shouldn't have the right,

14   for ease of their compilation of expert reports, to share

15   that info- -- publish that among the three different

16   defendants.

17          And I think Your Honor can understand why we're

18   sensitive to that.

19          THE COURT:  Okay.  Thank you.  Anyone else?  Oh, do

20   you want to play?

21          MR. HAUG:  Your Honor, what Mr. Connolly's

22   describing is not my version of reality in probably a hundred

23   of these cases.  Okay?  We didn't start this, first of all.

24   This is a Hatch-Waxman case that was started because his

25   client decided to copy the product, ask for generic

|Hearing
|14-cv-06102, August 24, 2015

1    permission, and they sent a notice letter, which started the

2    whole process.  And the same with the other two defendant.

3    So they're the ones who decided to go after this product.  So

4    it wasn't a problem of our making.

5         We sue them only here in New Jersey, and everyone

6    agreed that these cases should be consolidated.  And maybe if

7    they now don't want to consolidate the case, then I think

8    that's a whole new issue that would have to be raised and

9    then we decide whether -- you decide, the Court decides

10   whether or not we should have three separate cases going down

11   three separate tracks.

12        It's the other way to do it.  It's wholly

13   inefficient and for all the reasons the case is consolidated,

14   I think we'd speak against that.

15        So that's why I say, I think these issues do go

16   together, because I think that when you're talking about

17   highly proprietary, highly confidential information, it

18   should not be shared among the defendant -- any of the

19   competitors.

20        The argument they gave in their papers for not

21   sharing among themselves is because they're competitors with

22   each other.

23        Well, they're each competitors with us, because

24   they're obviously trying to market the same product.

25        THE COURT:  Okay.

 1          MR. HAUG:  All right?  So I think this would work a

 2    prejudice on our ability to efficiently conduct the case, and

 3    I think it would really undo the whole essence of

 4    consolidation.

 5          And I -- and I don't think in the end, but for

 6    agreement among parties, my experience is that many courts --

 7    I just had one right now before Judge Chesler, I had one in

 8    Judge Waldor with six defendants, I think, including Actavis,

 9    who's here today, and there is no such prohibition against

10    using information from one defendant in connection with some

11    issue relating to another.

12          THE COURT:  Okay.  Anyone else over here want to be

13    heard on the cross-party access?  No?  No one?

14          Okay.  All right.  I will take those issues under

15    advisement and get you a decision.

16          All right.  Next for today's hit parade.

17          MR. CONNOLLY:  Your Honor, I'm sorry --

18          THE COURT:  Yes.

19          MR. CONNOLLY:  -- I do -- if you're -- the letter,

20    I just wanted to note that there was -- I'm sorry,

21    Your Honor, it's Terrence Connelly for Par.

22          There was one other issue, disputed issue.  It's

23    contained in the letter.  I am not asking to be heard on it,

24    but there is a disagreement between the parties with respect

25    to paragraph 11, and that has to do with whether or not there

1   should be a patent prosecution bar.

2           As I said, Your Honor, I just wanted to let

3   Your Honor know that it is a dispute.  It's fully briefed.  I

4   am not suggesting that you need to hear argument on it,

5   although, if you would, we'd like to address it.

6           But, again, you'll see the parties' side-by-said

7   positions in Exhibit A, paragraph 11 of Exhibit A on page 10

8   of Exhibit A of Document 62.

9           The long and the short of it is the defendants want

10  a prosecution bar, and Supernus, plaintiff does not.

11          THE COURT:  Okay.  All right.  You're welcome to be

12  heard if you have something more you want to say on it?

13          MR. CONNOLLY:  Sure, Your Honor, it's again

14  Terrence Connelly for Par.

15          The long and the short of it is, Your Honor, we

16  believe that the attorneys who are -- be in -- of record in

17  the case, are being exposed to highly confidential

18  information should be prohibited from a patent prosecution

19  activities for a period of two years following completion of

20  the suit.  Patent prosecution bar is a very common because of

21  the difficulty, again, in unscrambling a person's brain; you

22  can't unlearn something that you know.

23          Plaintiff in this case has a different law firm

24  that prosecutes the patents in this case.  The plaintiff

25  says, well, yeah, but the prosecution bar is overbroad

1   because there might be some *interpartes* proceedings, a

2   quasi-litigation process in the Patent Office, Your Honor.

3   And, you know, I am not aware of there being any such

4   proceedings.  If such proceedings were initiated by one or

5   more of the defendants, we could talk with the plaintiff at

6   the time.  But right now we're talking about a prohibition

7   that the information that we're producing on our -- in this

8   case, would be produced to someone who could then participate

9   in continuing to prosecute the ongoing patent prosecution --

10  ongoing patent applications they've got.

11          Again, we've cited case law in the cover letter,

12  Your Honor, that is available, should you wish to review it.

13          It's a very simple issue.  Somebody who's been

14  exposed to highly confidential information knows the

15  specifics of our three particular products down to the level

16  of detail about, you know, what excipients we have and

17  et cetera, et cetera.  Then prosecuting a patent down the

18  road on this very same Trokendi product could

19  inadvertently -- I am not even suggesting that it would be

20  done in bad faith -- inadvertently knows something in the

21  back of one's head, which they get up and say, well, how

22  about I add this claim limitation.  That's the issue,

23  Your Honor.

24          THE COURT:  Okay.

25          MR. HAUG:  First of all, the DCO does already have

1    a prohibition against using any confidential information

2    produced in this case for any purpose other than this case.

3    And if I or any of my team or anybody else were to do that in

4    any way, that would be a violation of the -- of the Court's

5    order.  So there's already a prohibition.

6           What they're asking for is belt and suspenders and

7    also literally what would amount to a limitation on what we

8    can do as counsel for Supernus in the event that they take

9    action like filing an *interpartes*, an IPR, a petition for an

10   *interpartes* request.  Right?  Proceeding.

11          And so it's not whether there should be or

12   shouldn't be a prosecution bar only.  There already is a

13   prohibition against using their information.

14          THE COURT:  Using information.  Right.

15          MR. HAUG:  It's -- what do you mean by prosecution

16   bar?

17          The way they have it, they say prosecution of -- is

18   defined to include prosecution or reissue, a reexamination,

19   IPR proceedings, any substantive involvement with drafting,

20   amending or substituting claims, and it goes on.

21          And that's -- and then of course, two years, he

22   also wants me to never do anything for two years after we end

23   the case.

24          Now, Mr. Connolly said he's had a lot of these

25   cases.  Okay.  I believe him.

 1            Well, obviously, every one of those cases had a

 2    protective order in it.  And he gets access to a lot of

 3    confidential information, and I have no doubt he doesn't use

 4    confidential information from Case A in Case B or Case C.

 5    Period.

 6            And the same with my colleagues here who represent

 7    Actavis, who's in litigation with my client on another

 8    product.  And I'm assuming that when we produce confidential

 9    information in this case, it's not going to be used in the

10    other case.

11            So -- but we're all officers of the court here.

12            THE COURT:  But I think he's -- his --

13            MR. HAUG:  We have to trust each other.

14            THE COURT:  I think his argument was not same

15    client but same product.

16            Is that what you were saying?

17            MR. CONNOLLY:  Yes, Your Honor.  Terrence Connelly

18    for Par.

19            THE COURT:  Right.  Okay.  So go ahead.

20            MR. HAUG:  It's not quite that limited.  But, okay,

21    even with that, first of all, we're not prosecution counsel.

22    Right?  We're not prosecuting these patents.

23            My -- my concern, number one, is being able to

24    advise my client in connection with anything that's going on,

25    again, mindful of what we can or can't disclose in that

1    process.

2         And number two, if -- if -- any of them do file an

3    IPR, we certainly would want to have the right or the ability

4    to represent our client, assuming our client would want us to

5    do that, in that proceeding.  After all, they would be

6    involved.  They would be the one drafting it.

7         And if they draft an IPR and file it, they have had

8    access to our confidential information.

9         So am I to believe that they don't use that in the

10   process of preparing their IPR?

11        So if -- if you were -- if the Court was to

12   entertain a prosecution bar, then we're back to what's good

13   for the goose is good for the gander.  Then no one sitting

14   here in this case, none of the counsel of record in this case

15   can be involved in any future Patent Office proceeding.  I am

16   not advocating it should be that way, because I think that's

17   not called for.  I think that people can -- they know what

18   they're supposed to do and not do.

19        And so we very strenuously oppose a prosecution

20   bar.  There are cases cited.  It's actually page 5 of the

21   June 11 letter, which is Document 62.  There's a footprint

22   with about four or five cases from this District where the

23   various different judges did not institute a procession bar.

24        THE COURT:  Okay.  Thank you.

25        All right.  Next issue.  Amendments to the

1  schedule.

2            MR. HAUG:  If I may, Ed Haug, Supernus, I'll keep

3  going.

4            Yes, another issue is there is a -- I guess a joint

5  request at this point to have a date for the substantial

6  completion of documents production.  And then there's a

7  joint --

8            THE COURT:  Competing proposals.

9            MR. HAUG:  Correct.  And one date, they're in

10 November, I think, and we're in January.

11           And then there's also a request, a joint request

12 for the close of fact discovery, and we're closer there, 14

13 days or 30 days before the exchange of affirmative expert

14 reports.

15           THE COURT:  Okay.

16           MR. HAUG:  I think on the first point on the

17 substantial completion of document production, first, I'll

18 point out that we have already produced what I believe to be

19 maybe 85, 90 percent of all the relevant documents that are

20 going to be used in this case.  They've already been

21 produced.

22           What we're really talking about is ESI, and we have

23 not completed the meet-and-confer process on ESI.  It's

24 gotten pretty complicated, and I won't really characterize

25 it, because as I said, we're in the meet-and-confer process.

1          However, if -- if we wind up anywhere near what the

2   defendants want, we're probably talking, as upwards of one

3   and a half to two million pages of documents that we would

4   have to find, collect, review, produce.

5          Now, I don't think we should be doing that in any

6   way.  But it's possible that that's the way we come out or

7   even close to that.

8          And so to have a November date right now would be,

9   I think, arbitrary in view of the ESI meet-and-confer that

10  hasn't been completed.

11         And so the January date we picked is reasonable,

12  given the schedule in the case.  Right?  And I think we can

13  certainly live with that.

14         And I think that we'll --

15         THE COURT:  In your meet-and-confer, you're still

16  working on terms?  Search terms?

17         MR. HAUG:  Yes.

18         THE COURT:  Okay.  So I've got --

19         MR. HAUG:  That's really where it is.

20         THE COURT:  Okay.

21         MR. HAUG:  Now, I -- in all fairness, I think we're

22  actually waiting for them to respond to our last comeback to

23  them on that whole issue, so that's probably going to be

24  forthcoming.

25         But anyway, so we're apart about two months on the

 1    date for substantial completion of documents.

 2              I would suggest the January date is reasonable.

 3              Obviously, if there are depositions that need to be

 4    taken, and I think there are specific documents they need,

 5    they can ask me for it, but I don't think that's going to be

 6    really the issue.

 7              And then on the close of fact discovery, as I said,

 8    we're like two weeks apart.

 9              THE COURT:  Two weeks apart.  I'm sure I can figure

10    out a good date.

11              MR. HAUG:  Yes.

12              THE COURT:  All right.  Over here?

13              MR. GAERTNER:  Your Honor, Mike Gaertner, on behalf

14    of Zydus.

15              I'm going to at least open the show on this, and

16    I'll let my colleagues weigh in as much as they want.

17              I'm going to talk a moment about ESI and where we

18    are, and maybe make a proposal on that that would get some

19    traction with the Court.

20              But the whole purpose of a substantial completion

21    date, of course, is to keep the parties moving and to avoid a

22    scenario when one side or the other or one party or the other

23    dumps a huge bolus of documents on the other side when we're

24    approaching the end of fact discovery.  And I'm afraid that's

25    what is going to happen here.

1              THE COURT:  I like rolling, rolling, rolling,

2      rolling, yes.

3              MR. GAERTNER:  If we accept -- well, we --

4      everybody promises to roll, and you hope that happens, and

5      everybody pledges to do it.  I'm sure we'll all do it the

6      best we can.

7              But -- but what I'm concerned about is if you push

8      this -- if we push this date out until January, we're going

9      to have a scenario -- because, keep in mind, let's assume

10     that substantial completion is January 20th, as plaintiffs

11     propose.  You're not going to start taking deps until

12     February.  That is only 10 days away.  And all of a sudden,

13     now, we have all these depositions that have to take place in

14     essentially a month and a half to maybe two months; maybe

15     less than that, if we get a March 1st cut-off date.

16             Right now, under the proposed discovery scheduling

17     order, I'll tell you the number of depositions each side had

18     served.  They're not going to say we're going to take all

19     these.  But there's a number of them.

20             There is, as I believe, I have some notes here, the

21     plaintiffs have the right to take 12 depositions of each

22     defendant.  That's 36, if they take them all.  Not saying

23     they are.  But that's 36.

24             We have the right collectively to take 12 of the

25     plaintiff.  So we're already at 48 depositions.  Again, not

1  saying we are going to take all those.  But there's no gosh

2  darned way we're going to get that done in a month and a

3  half.

4          Keep in mind when you lay on top of that, Judge,

5  that we've got four law firms and a witness that we're going

6  to have to coordinate -- that's five schedules -- trying to

7  get all that done -- I think the plaintiff talked about

8  reality of the situation.  Well, the reality of the situation

9  is if we wait until January 20th, we're not going to get

10  close to getting fact discovery done in March.  It's simply

11  not going to happen.

12          But what are the other problems that are going to

13  happen?  One, it's going to really eliminate the ability to

14  take follow-up discovery.  If we get the document production,

15  we start taking depositions, what's that usually spawn?  You

16  hope a narrowed set, but a set of targeted second requests

17  for interrogatories or you're following up on a witness or

18  you looked at a document and you've decided you need

19  something else.

20          We push that back into February, that's not going

21  to be done by the close of fact discovery.

22          And what else is it going to push off?  Privilege

23  disputes.  We haven't talked yet about exchanging logs, but

24  we can't do that until we have at least substantial

25  completion.  When will our logs be exchanged?  Again, we're

 1    looking at February, if we're talking a January 20th,

 2    substantial completion date.  So that means we're going to

 3    have meet-and-confers over privilege disputes, productions

 4    after that, potentially motion practice, that's going to be

 5    bleeding into the depositions, which lead to requests to

 6    reopen depositions.

 7            Again, I think a scenario that nobody really,

 8    really wants to do here.

 9            We proposed November 20th.  That's seven months

10    after the service of written document requests.  We don't

11    think that's moving particularly quickly here.

12            THE COURT:  Tell me about your view on the

13    meet-and-confer to date with regard to ESI.

14            MR. GAERTNER:  I think -- when I -- I think we

15    should have a court order says we have to be done with the

16    meet-and-confer process two weeks from tomorrow, because I

17    think we proposed ESI search terms back in July, and now

18    we're sort of towards the end of August -- and I am not

19    pointing fingers at anybody.  It's taken longer than we need

20    to.  And unfortunately, just like a substantial completion

21    date, without an order to get it done in a certain time,

22    we're just going to keep on going back and forth.

23            Mr. Haug is correct.  We got a very lengthy letter,

24    I think, last week or so, from the plaintiffs, and we're --

25    we've actually drafted a response we'll get to them.

|Hearing
|14-cv-06102, August 24, 2015

1          But we, on behalf of the defendants, are open to a
2   deadline to getting it done so people take the effort that
3   they need to to get it done.  That includes talking to the
4   plaintiffs about what they are concerned about, the scope of
5   it.  We haven't -- we've heard some of these large numbers
6   thrown around.  Really not sure where they are coming from,
7   but we're willing to talk to them about it.  But we'd like to
8   see that cabined so that's over so we can move on and so we
9   can get this document production done rather than really try
10  to compress this into a very short period of time.

11          Now, that sort of is the reason why we've -- we've
12  talked about 30 days between the production of documents --
13  I'm sorry -- the end of fact discovery and experts.  And you
14  think, geez, why can't you guys come to an agreement on a few
15  day on this.  I'm sure, Your Honor.

16          One of the reasons why we talked about that is
17  we've all been there.  There's always the risk if you're
18  going to take a deposition or two out of time, that you're
19  going to need a little breathing space here or there.

20          We start stacking these dates so close to one
21  another, what happens, of course, is that puts pressure on
22  the dates in the later schedule, if we have a deposition that
23  has to be canceled or someone's sick or something like that.

24          I can tell you on behalf of Zydus, our witnesses,
25  there's going to be international travel involved.  That's

 1   going to be some problems either on the attorney side or on

 2   the witness side.

 3          So there are -- there are just issues like that

 4   that we think it's prudent to build a little bit -- I don't

 5   think it's extra time, it's only 30 days between the close of

 6   fact and experts.

 7          But we're trying to segment these dates to really

 8   stick to the schedule.  And we're really concerned.  And if

 9   we don't get document production done, substantially done,

10   remember, that's -- that's a nice word here.  Nobody says

11   everything's going to be a hundred percent done.  But if we

12   can't pick a sooner date than January 20th, I'm really

13   concerned is we're going to be back before Your Honor in

14   January, February, with a whole bunch of problems that are

15   going to put a lot of pressure on the schedule.

16          THE COURT:  Okay.

17          Anything else.

18          MR. CONNOLLY:  Your Honor, Terrence Connelly for

19   Par.

20          All I'm going to say, Your Honor, is you can

21   always -- there's always a relief valve to move a date back.

22   If it turns out that the schedule that we proposed is, in

23   fact, absolutely unworkable, then I'm sure we'll hear from

24   Mr. Haug, and we'll either work it out or he'll come to you

25   and you can push that date back.

 1            But there's no way to gain back time that's lost.

 2            So, Your Honor, with people, human nature being

 3    what it is, we would request, the defendants would request

 4    that you set the earlier dates that we proposed.

 5            And Your Honor always has the opportunity for good

 6    cause shown to push those dates back.  But if we start with

 7    them, the later dates, there is -- as much as I'd like to

 8    have a time machine and take about 20 years off my life,

 9    that's does -- that's not the way time works, Your Honor.

10            THE COURT:  And on the ESI protocol?

11            MR. CONNOLLY:  We are in favor of Your Honor

12    ordering the parties to fish or cut bait on that within two

13    weeks of tomorrow.  I think the two weeks from today is a

14    holiday, so we would also request a verbal order telling us

15    to be big boys and girls and do that.

16            THE COURT:  Okay.  Oh, sorry, another one over here

17    before you get to go?

18            MR. BOGGS:  Your Honor, Jeff Boggs for Actavis.

19    We're also in favor of the order for two weeks to work this

20    out.

21            Thank you.

22            THE COURT:

23            MR. HAUG:  As I said and I think Mr. Gaertner also

24    said, we have the letter out to them on the ESI.  It's a very

25    detailed, lengthy letter.  We're waiting for a response.  As

 1   soon as they give us a response, we can meet and confer and

 2   see where we are and I think report back to the Court

 3   hopefully in less than two weeks.

 4            THE COURT:  When was that letter out?

 5            MR. HAUG:  August 17th.

 6            The last meet-and-confer we had on this was

 7   August 10th.

 8            THE COURT:  Okay.

 9            MR. HAUG:  We then sent out a -- as I said, a

10   letter with proposed compromise on search terms, et cetera,

11   on August 17th.  And we're waiting for that response.

12            THE COURT:  Okay.  It's been a week.

13            MR. HAUG:  And I think that goes in -- yup.

14   Well --

15            THE COURT:  I was going to ask, anyone have a

16   chance look at it in the past week?

17            MR. CONNOLLY:  Yes, Your Honor, we're actually

18   working on a response -- just to put it in the context,

19   Your Honor -- again, I'm sorry.  Terrence Connelly for Par.

20            It's a 19-page, single-spaced letter, and we've got

21   three defendants.  So we're parsing through it.

22            THE COURT:  So you're feeling my pain, aren't you?

23   You're feeling my pain.

24            MR. CONNOLLY:  I -- I do feel your pain.

25            THE COURT:  Okay.  Times a thousand cases, yes.

 1            ATTORNEY FOR DEFENSE:  In a little bit of different

 2    pain, it's return to college season, for some of the parents

 3    here, so I apologize for the delay.  But we've been taking

 4    some kids back to college.  So it's a tough time.  But we

 5    will get -- get to them very quickly.

 6            THE COURT:  No.  Understood.  Understood.

 7            MR. HAUG:  I am not the one that's complaining

 8    about them dragging their heels.  I'm hearing it not coming

 9    back that way, but, all right.  I'm a big boy, I can take

10    that.

11            The fact of the matter is they should get back to

12    us on the 19-page letter.  And it's not just about our

13    information; it's also about all of their information.  And I

14    think we can report back to the Court not only on hopefully

15    an agreement we reached on ESI, and then maybe both, we can

16    then also agree on these two dates that we're talking about

17    right now.

18            THE COURT:  Okay.

19            MR. HAUG:  And by the way, I would also, for the

20    record, substantial completion of documents, stand here right

21    now, I think we've already done that.  We have produced all

22    of the development documents, all of the IP documents, all

23    the patent file histories, the NDA, the IND, lab books.  If

24    they wanted to take a deposition of the inventor now, they

25    could.  They have the information.

 1               What they're looking for is what they don't know.

 2     They're just asking for, well, but go through all of your

 3     entire electronically stored information and then tell us if

 4     there's something else that is relevant or -- I'll stop

 5     there.  I won't go into the meet-and-confer.

 6               THE COURT:  Okay.  All right.

 7               Anything else over here?  No?  Okay.

 8               I think we've covered the letter at this point.

 9     Okay.  I will reserve and get you a decision posthaste, as

10     they say.

11               Anything else from plaintiff for today?

12               MR. HAUG:  No, Your Honor.

13               THE COURT:  Anything else from defense?

14               MR. GAERTNER:  Mike Gaertner.

15               No, Your Honor, for Zydus.

16               MR. CONNOLLY:  Terrence Connelly.

17               No, Your Honor, for Par.

18               MR. BOGGS:  Jeff Boggs for Actavis, we have nothing

19     further.

20               THE COURT:  Okay.  Well, it is 5 o'clock, but it

21     doesn't mean you have to go.  The building is open till 10.

22     And I am more than happy for you folks to continue to meet

23     and confer, since you're all here, and actually, I'll expect

24     at least the next 15 minutes, you'll do what you can to work

25     on these issues.

|Hearing
|14-cv-06102, August 24, 2015

1             All righty, and thank you all very much.  We are

2  adjourned.  Good day.  And...

3             (Conclusion of proceedings at 4:58 P.M.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          Certification

2          I, SARA L. KERN, Transcriptionist, do hereby certify

3     that the 50 pages contained herein constitute a full, true,

4     and accurate transcript from the official electronic

5     recording of the proceedings had in the above-entitled

6     matter; that research was performed on the spelling of proper

7     names and utilizing the information provided, but that in

8     many cases the spellings were educated guesses; that the

9     transcript was prepared by me or under my direction and was

10    done to the best of my skill and ability.

11         I further certify that I am in no way related to any of

12    the parties hereto nor am I in any way interested in the

13    outcome hereof.

14

15

16

17

18    S/ *Sara L. Kern*                       26th of August, 2015

19    _____    _____
      Signature of Approved Transcriber              Date

20

21
      Sara L. Kern, CET**D-338
22    King Transcription Services
      3 South Corporate Drive, Suite 203
23    Riverdale, NJ  07457
      (973) 237-6080
24

25